IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FLOYD OVERTURF,                    )
                                   )
            Plaintiff,             )
                                   )
vs.                                )     Case No. 3:17-CV-00762 -MAB
                                   )
WEXFORD HEALTH SOURCES, ET         )
AL.,                               )
                                   )
            Defendants.            )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Floyd Overturf, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges Eighth Amendment claims against Defendants, detailing they have been deliberately indifferent to his serious medical issues while he was incarcerated at Big Muddy River Correctional Center ("Big Muddy") (Doc. 17). Now before the Court is Defendants Gerst and Neal's motion and supporting memorandum for summary judgment (Docs. 89, 90) and Defendant Isaacs' motion and supporting memorandum for summary judgment (Docs. 93, 94). For the reasons set forth below, the Court grants Defendants' motions for summary judgment.

### PROCEDURAL BACKGROUND

Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. §1983 on July 20, 2017(Doc. 1), alleging Eighth Amendment constitutional violations against officials at Big Muddy (Doc. 1). Following a threshold review of the complaint pursuant to 28 USC § 1915A, Plaintiff was permitted to proceed on four Eighth Amendment Claims:

**Count 1**: From November 20, 2016 to November 29, 2016, Jane Doe #1 [Defendant Minor] showed deliberate indifference to Plaintiff's serious medical need involving his psoriasis by failing to provide Plaintiff with his prescribed medication in violation of the Eighth Amendment.

**Count 2**: From November 22, 2016 through December 5, 2016, Jane Doe #2 [Defendant Isaacs] showed deliberate indifference to Plaintiff's serious medical need involving his psoriasis by deliberately ignoring Plaintiff's request slips and emergency grievance regarding his prescribed medications, his discomfort, and the risk of harm he faced from open sores in violation of the Eighth Amendment.

**Count 3**: On November 29, 2016 and December 19, 2016, John Doe #1 [Defendant Neal] showed deliberate indifference to Plaintiff's serious medical need involving his psoriasis by failing to provide Plaintiff with medical treatment and delaying and denying him access to appropriate medical treatment in violation of the Eighth Amendment.

**Count 4**: On December 15, 2016, P.A. Gerst (John Doe #2) showed deliberate indifference to Plaintiff's serious medical need involving his psoriasis by failing to provide Plaintiff with medical treatment in violation of the Eighth Amendment.

(Doc. 17, pp. 7-8).

Plaintiff was appointed counsel and, through counsel, filed a motion for leave to file his First Amended Complaint on June 25, 2018 (Doc. 51), which was granted (Doc. 52). Plaintiff's First Amended Complaint named the Doe Defendants (Doc. 51, p. 2; Doc. 53). Defendants Gary A. Gerst (John Doe #2), Deborah Isaacs (Jane Doe #2), Brad D. Neal (John Doe #1), and Kristen A. Minor (Jane Doe #1) were added in this amended complaint (Doc. 53, pp. 2-3).

On August 26, 2019, Defendants Gerst, Minor, and Neal filed their motion and supporting memorandum for summary judgment (Docs. 89, 90). On September 9, 2019, Defendant Isaacs also filed a motion and supporting memorandum for summary

judgment (Docs. 93, 94). On October 25, 2019, after seeking an extension, Plaintiff responded to Defendants' motions for summary judgment (Docs. 99, 100, 101). Also on October 25, 2019, Plaintiff and Defendant Minor filed a motion for dismissal with prejudice, which the Court granted and Defendant Minor was dismissed with prejudice (Doc. 102, 109).[1]

## FACTUAL BACKGROUND

### A. The Parties

Plaintiff has been incarcerated in the Illinois Department of Corrections since 2009 (Doc. 90-1, p. 30). Plaintiff was incarcerated at Big Muddy from approximately August 2009 until March 8, 2017 (*Id.* at p. 36).

Defendant Isaacs is a registered nurse (Doc. 94-8, p. 4). She has been the Health Care Unit Administrator (HCUA) at Big Muddy since 2004. *Id.* As the HCUA, she does not actually administer medical care to inmates; rather, she oversees the healthcare unit, but does not supervise any of the healthcare providers (*Id.* at p. 5). She monitors the contract between IDOC and Wexford and does this by reviewing records and physical exams, for example, to ensure Wexford is following the Administrative Directives and Institutional Directives. *Id.*

Defendant Isaacs does not monitor the receipt of sick call slips from the inmates and under her job description, does not ensure there are enough blank request slips in

---

[1] Plaintiff and Defendant Minor labeled their filing a Stipulation of Dismissal, but because it was only between Plaintiff and one defendant, it was ineffective as a stipulation and the Court construed it as a motion for dismissal with prejudice and granted it (*See* Doc. 109).

the housing units, for example (*Id.* at p. 7). Instead, nurse sick call slips are logged by the nurses (*Id.* at p. 8). Additionally, Defendant Isaacs does not monitor the pharmacy for accuracy of prescription refills or dispensing of prescriptions (*Id.* at p. 6).

Defendant Neal is a registered nurse who worked at Big Muddy in 2016. As a nurse, Defendant Neal is not able to prescribe medication (Doc. 90-4, pp. 14-15, 31); however, he is able to medically evaluate prisoners and provide certain medical treatment, including determining whether a prisoner is experiencing a medical emergency that requires immediate attention (*Id.* at p. 33). Defendant Neal can also refer the prisoner directly to Dr. Larson in cases where a prisoner needs immediate medical attention (*Id.* at pp. 33, 96-97).

Defendant Gerst has been employed as a Physician's Assistant at Big Muddy since 2009 (Doc. 90-8, p. 1). As a Physician's Assistant, Defendant Gerst has the ability to immediately "go up" the chain and get medicine from another pharmacy right away if the medical need is serious enough (Doc. 99-1, p. 15).

### B.  Timeline of Plaintiff's Medical Care

Plaintiff is diagnosed with psoriasis, an auto-immune disorder that manifests, among other ways, in skin plaques (Doc. 100, p. 1). Plaintiff has had psoriasis on his elbows, legs, back, thighs, and buttocks for years, and his symptoms, including itching, vary in severity based on treatment. *Id.* There is no cure for psoriasis, so the treatment for psoriasis is symptom management. Plaintiff's psoriasis also causes skin lesions (spots) that itch (Doc. 90-3, p. 37). When the condition flares up, Plaintiff describes experiencing thick plaques, burning, and cracking of the skin. Plaintiff contends that when his psoriasis

goes untreated, his skin will crack, bleed, and, sometimes, a clear discharge will ooze from his open skin cracks (Doc. 90-1, p. 50).

In 2016, Plaintiff's psoriasis was being managed with the ointment, betamethasone. Plaintiff received a 45-gram tube of betamethasone on September 23, 2016. On October 6, 2016, at Plaintiff's request, Dr. Larson increased the amount of betamethasone per month from 90g to 135g as needed (Doc. 90-2, pp. 37-39, 230). With each container of betamethasone, Plaintiff received a sticker. Plaintiff was to turn in the sticker from the prior tube or container to receive the new container of medication when needed (Doc. 90-1, pp. 59-60).

As betamethasone is a prescription, the providers at Big Muddy had to order it from an outside pharmacy called BosWell. BosWell would fill the order and provide the medication to the facility. When a prescription ointment is ordered, as needed, over a course of time, the pharmacy can fill portions of the prescription and it is up to the patient to notify the healthcare unit when more ointment is needed. Therefore, if a patient is prescribed 135g of a medication for one month, he could receive 45g and request a refill every 10 days. In other words, 135g is the maximum amount the patient will receive and not the minimum (Doc. 90-1, p. 58; Doc. 90-3, pp. 51-52). Prior to October 2016, Plaintiff's ointment was ordered as needed and he received it in varying increments (Doc. 101, p. 2; Doc. 90-2, pp. 173-179).

On October 11, 2016, Plaintiff received 90g of betamethasone from a monthly prescription of 135g (Doc. 90-1, p. 57; Doc. 90-2, p. 181). When Plaintiff ran low on his supply, he sent a request to renew his prescription. On November 9, 2016, Defendant

Minor, a medication room technician, faxed a refill request for Plaintiff's betamethasone to BosWell (Doc. 90-1, pp. 58-61; Doc. 90-7). On November 10, 2016, Plaintiff received 45g of betamethasone (Doc. 90-1, p. 59; Doc. 90-2, p. 182).

Plaintiff turned in a refill sticker to refill his betamethasone prescription on or about November 15, 2016 (Doc. 90-1, p. 107). By November 18, 2016, Plaintiff had completely exhausted his supply of betamethasone (*Id.* at p. 73). By November 22, 2016, Plaintiff still had not received his betamethasone refill, so that same day, he filled out an inmate request slip to the Heathcare Unit, detailing that he was out of betamethasone and had not yet received his refill (Doc. 90-1, pp. 73-74; Doc. 94-5). Plaintiff did not receive a response to his inmate request slip (Doc. 90-1, p. 74).

By November 25, 2016, Plaintiff testified that his untreated psoriasis plaques were very thick, painful, and oozing clear fluids. Plaintiff described his pain as a "six" on a ten-point scale (*Id.* at pp. 76-77). That same day, Plaintiff filled out a second inmate request slip to be seen by the nurse and get a refill of his betamethasone (*Id.* at p. 76). Plaintiff wrote that his psoriasis was "deteriorating really bad" and also indicated he had a 135g prescription from Dr. Larson, but only received 45g on November 10 and requested someone look into this issue. *Id.* Plaintiff placed the inmate request slip in the Healthcare box on his wing on November 25, 2016. *Id.* Plaintiff did not receive a response to this request, either. On November 28, 2016, Plaintiff met with his grievance counselor, Lisa Allen, and told her about the issues with his prescription and his two unanswered request slips (*Id.* at pp. 79-80). From the record, it appears that Counselor Allen did two things:

she somehow pushed through a nurse sick call request for Plaintiff and she contacted Defendant Isaacs. *Id.*

On or around November 29, 2016, Plaintiff saw Defendant Neal, a nurse, regarding a refill of his betamethasone prescription and, as Plaintiff described, to get some immediate relief as he was "in bad shape" and "expect[ed] to receive some sort of treatment," perhaps in the form of hydrocortisone cream (*Id.* at pp. 80-81). Defendant Neal had already reviewed Plaintiff's medical records and notified the pharmacy that Plaintiff was due for additional betamethasone. Defendant Neal informed Plaintiff that he should be receiving it through the medication line and that he had personally left a note for the pharmacy concerning the medication (Doc. 90-1, pp. 78-81; Doc. 90-2, p. 40; Doc. 90-9). Plaintiff testified that Defendant Neal did not examine him and did not acknowledge Plaintiff when he attempted to show him the open sores on his leg. Additionally, Plaintiff testified that Defendant Neal became agitated when Plaintiff protested and ultimately told Plaintiff that his medication would be ordered, but did not explain to him when he should expect his betamethasone to arrive (Doc. 90-1, pp. 77-81). Plaintiff testified Defendant Neal then asked Plaintiff to leave (*Id.* at p. 82).

BosWell did not fulfill the November 29th request for betamethasone (Doc. 90-6). Defendant Minor testified that BosWell made the decision about the refill, as a determination of when a prescription should or should not be refilled is not part of her job description (Doc. 90-5, pp.85-86).

On November 30, 2016, Counselor Allen sent Defendant Isaacs an email about Plaintiff's unfilled psoriasis medication (Doc. 90-1, p. 79; Doc. 94-9). Defendant Isaacs

testified that she contacted the pharmacy tech to see what Plaintiff had been given and when he received the medication, although she was unsure of the exact date (Doc. 94-8, p. 18). This is her normal procedure for a situation like this (*Id.* at p. 16).

On December 5, 2016, after not receiving any treatment or information about when he would receive his betamethasone order, Plaintiff filed an emergency grievance (Doc. 90-1, p. 77; Doc. 94-10). Plaintiff did not receive a response to his emergency grievance within 48 hours, so he filed a second grievance on December 7, 2016 (Doc. 90-1, p. 78).[2]

On December 14, 2016, Defendant Isaacs received a copy of Plaintiff's December 5, 2016 grievance from his grievance counselor, Lisa Allen. Counselor Allen's cover memo to Defendant Isaacs directs her to respond to the grievance within seven days (Doc. 94-10). Defendant Isaacs did not comply with this direction to respond within seven days. Additionally, she did not respond to Counselor Allen concerning this grievance either (Doc. 99-2, p. 4).

Although Defendant Isaacs does not typically monitor request slips (submitted by prisoners to see a medical professional), on occasion, the healthcare unit may receive a request slip if it is addressed to Defendant Isaacs (Doc. 94-8, p. 7). If Defendant Isaacs receives an inmate request slip, she will try to address the issue. If it is a complaint that the inmate did not receive their medications, she would contact the pharmacy tech (Defendant Minor, in this case) and have her look into it (Doc. 94-8, p. 7); however,

---

[2]Plaintiff did not receive a response to either grievance for over a month until Defendant Isaacs responded on January 13, 2017 (Doc. 94-7, p. 2). Plaintiff's December 5 grievance was deemed a non-emergency by the Warden (Doc. 94-10).

Defendant Isaacs testified that while this is the typical protocol, she could not say, with certainty, this was the process followed for Plaintiff's request slips (*Id.* at p. 15). In fact, Defendant Isaacs testified that she had no recollection of how or if she addressed Plaintiff's requests slips here (*Id.* at pp. 15-16). Plaintiff may have met with Defendant Isaacs at some point during his time at Big Muddy, but admits he never discussed his psoriasis conditions with Defendant Isaacs (Doc. 90-1, p. 106).

On December 15, 2016, Plaintiff saw Defendant Gerst during a regularly scheduled appointment at the chronic clinic for his thyroid and diabetes (*Id.* at pp. 84-85). At this point, Plaintiff rated his psoriasis pain as "extreme" and equivalent to a seven out of ten (*Id.* at pp. 84-88;). Plaintiff told Defendant Gerst about his psoriasis medication issues. Defendant Gerst told Plaintiff he would check on the prescription and he asked the nurse to also check on the prescription to see if they had received any medication from BosWell (Doc. 90-1, pp. 84-88; Doc. 90-8, pp. 1-5). Plaintiff contends that he tried to explain his condition and all of the body parts affected by his untreated psoriasis, but Defendant Gerst ignored him (Doc. 90-1, pp. 86-87).

During this visit, Defendant Gerst conducted an examination, although the parties disagree as to its extent. Defendant Gerst contends he examined Plaintiff's skin and noticed a little red patch on his elbow that was dry, without discharge, and not bleeding. Therefore, he did not observe any immediate medical need, but still recorded Plaintiff's prescription for 135g of betamethasone to ensure Plaintiff would receive it. Plaintiff contends Defendant Gerst only noticed the red patch on his elbow because he did not examine his entire body and, therefore, did not notice the psoriasis spots that had flared

up on his legs that were found to be infected four days later (Doc. 99-1, p. 9). Plaintiff testified that when he pulled up his pant legs and attempted to show Defendant Gerst the sores on his legs, Gerst simply walked away. When asked if he could give him any medication that would help alleviate his pain and other symptoms immediately, Defendant Gerst simply said, "No, Mr. Overturf" (Doc. 90-1, pp. 86-88). Plaintiff never followed up with Defendant Gerst to communicate that he had not received his betamethasone prescription (*Id.* at pp. 85-88).

After this December 15, 2016 appointment, Plaintiff's pain continued to worsen, going from what he described to be a seven out of ten to an eight-and-a-half out of ten, which Plaintiff likened to pain he experienced when he broke his arm and leg on separate occasions (*Id.* at pp. 89-90). After December 15, Plaintiff testified he was substantially limited in his activities due to the pain and discomfort of moving and any contact with his affected skin areas. For example, Plaintiff could not perform certain tasks (*e.g.*, scrubbing the showers) associated with his job as a midnight porter because his psoriasis was bothering him so much (*Id.* at pp. 121-122).

On December 19, 2016, Plaintiff went back to the healthcare unit because he believed he had an infection that started on, approximately, December 16 or 17 (Doc. 90-1, p. 91). Plaintiff contends that Defendant Neal initially refused to allow Plaintiff to see the doctor and threatened him with discipline, only capitulating when another nurse intervened (*Id.* at pp. 88-90). At that time, Defendant Neal referred Plaintiff to Dr. Larson. Dr. Larson documented that Plaintiff reported an itchy, tender skin lesion on his left leg and an itchy groin. Dr. Larson observed redness in the Plaintiff's groin and a 9x10

centimeter spot on Plaintiff's left leg. The spot on Plaintiff's leg was dry, without drainage, red, and tender with some swelling. Dr. Larson's assessment was a history of psoriasis, a possible jock itch/rash, and a possible secondary infection on his left leg. Dr. Larson ordered 10 days of antibiotics for the possible infection, hydrocortisone, and anti-fungal cream for the possible jock itch, and Benadryl to help with the itching (Doc. 90-1, pp. 92-93; Doc. 90-3, pp. 48, 20-27). Dr. Larson did not change Plaintiff's prescription for 135g betamethasone, but assured Plaintiff that he would receive the 135g of betamethasone on December 21, 2016, two days after seeing Dr. Larsen (Doc. 90-1, pp. 93-94; Doc. 90-2, pp. 43-46; Doc. 90-3, pp. 20-27).

Plaintiff received 135g of betamethasone on December 21st or 22nd, 2019 (Doc. 90-1, pp. 93-94). Plaintiff contends it took three months for the areas of his skin affected by psoriasis to return close to normal once he received 135g of betamethasone and the other medications prescribed by Dr. Larsen (Doc. 90-1, pp. 76, 94). On or around December 28th, Plaintiff saw Defendant Gerst for a check-in unrelated to his psoriasis; Defendant Gerst did not examine Plaintiff or inquire about his psoriasis, and Plaintiff likewise did not alert Defendant Gerst to any issues with his psoriasis (Doc. 99-1, pp. 17-18; Doc. 90-2, p. 48).

Defendant Isaacs responded formally to Plaintiff's grievances on January 13, 2017 (Doc. 94-8, pp. 56-60; Doc. 94-7, p. 2). Plaintiff's December 5, 2016 grievance was deemed a non-emergency by the warden (Doc. 94-10). In her response, Defendant Isaacs mistakenly claimed that Plaintiff did not notify staff about needing his medication refill until November 29, 2016 (Doc. 94-11). While Defendant Isaacs testified that she was

unsure if she had addressed Plaintiff's request slips, she did testify that she contacted the pharmacy tech, Defendant Minor, before drafting her response to Plaintiff's grievance (Doc. 94-8, pp. 17-18).

From October through December 2016, Plaintiff had an active prescription for 135g betamethasone (Doc. 90-2, pp. 179-185). At various times, Plaintiff asked Defendants Neal and Gerst for any treatment that might alleviate his pain from the psoriasis plaques that had flared up, including asking for hydrocortisone cream (Doc. 90-1, pp. 81, 86). Plaintiff details that it took eight days after he saw Dr. Larsen for his pain to subside to manageable levels and three months before the psoriasis spots that had flared up to fully subside (Doc. 90-1, p. 94).

### Legal Standard

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, but instead to determine whether there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). In deciding a motion for summary judgment,

"[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the nonmoving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

### ANALYSIS

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "It is well established that persons in criminal custody are entirely dependent on the state for their medical care." *Mitchell v. Kallas*, 895 F.3d 492, 496 (7th Cir. 2018) (citing *Estelle*, 429 U.S. at 103). The Supreme Court has thus recognized that the Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care. *Gabb v. Wexford Health Sources, Inc.*, No. 18-2351, 2019 WL 2498640, at *3 (7th Cir. June 17, 2019) (citing *Estelle*, 429 U.S. at 102–03); *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, (1994)).

In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-92. Second, the plaintiff must establish the individual prison officials were deliberately

indifferent to that condition. *Id.*

### I.  Serious Medical Need

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.* It can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

Defendants contend that Plaintiff's psoriasis does not constitute a serious medical condition because rashes, even those that cause itching and pain, are rarely classified as such in deliberate indifference cases (Doc. 90, p. 8; Doc. 94, p. 13). Defendants argue that Plaintiff's condition did not interfere with his ability to perform daily functions; that it appeared only as red spots that were itchy and caused slight discomfort; and that he never went without treatment, as he had a current prescription throughout November and December 2016, even if there was delay in it being filled (Doc. 90, pp. 9-10; Doc. 94, pp. 13-14).

Plaintiff disagrees and details that it took eight days after he finally received his prescription for his pain to subside to manageable levels and three months before the psoriasis spots that had flared up to fully subside (Doc. 90-1, p. 94). Three of the plaques that went untreated between November 18, 2016 and December 19, 2016 had not completely gone away by the time of Plaintiff's deposition on April 26, 2019 (Doc. 90-1,

p. 76). From December 15 until his prescription refill on or around December 22, 2016, Plaintiff testified he was substantially limited in his activities due to the pain and discomfort of his psoriasis. Lastly, Plaintiff contends his psoriasis plaques became infected. Dr. Larsen, who examined Plaintiff during this time, testified that the spot on Plaintiff's leg was dry and without drainage, indicating a possible, but not definite, infection on this leg.

In support of their arguments, Defendants cite to precedent where courts have found that skin rashes are not considered serious medical conditions for purposes of a deliberate indifference claim. *See, e.g., Smith v. Schwartz,* No. 10-721-GPM, 2011 WL 2115831, at *3 (S.D. Ill. May 26, 2011). Courts have found, however, that once a skin rash becomes infected, it *may* constitute a serious medical condition for purposes of a deliberate indifference claim. *See Oliver v. Stadnicki,* No. 14 C 9149, 2015 WL 4266411, at *3 (N.D. Ill. July 10, 2015) (where the court held that a plaintiff's mild foot fungus that later developed into an infection resistant to treatment could constitute a serious medical condition).

The Court is skeptical that Plaintiff's condition constitutes an objectively serious medical condition. Plaintiff does describe a constant series of ailments that impeded his daily life and progressed drastically within just a week or two without his prescribed topical cream. But there is not conclusive evidence that Plaintiff's psoriasis ever became infected. In fact, Dr. Larsen indicated there was a possible, but not definite, infection on Plaintiff's leg. Ultimately, because the Court concludes that summary judgment in favor of Defendants is warranted on the subjective prong, the Court will err on the side of

caution in this instance and assume a reasonable jury could find Plaintiff's ailments to be a serious medical need.

## II.    Deliberate Indifference

In order to show that prison officials acted with deliberate indifference, a plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious health risk, but they consciously disregarded that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution.").

In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073; *Hayes v. Snyder*, 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citation omitted).

### A.  Count 2—Deliberate Indifference Claim Against Defendant Isaacs

Plaintiff argues that from November 22, 2016 through December 5, 2016, Defendant Isaacs showed deliberate indifference by doing nothing to address Plaintiff's grievances for over a month regarding his medication refill amounting to a constitutional violation (Doc. 99, p. 10). In addition, Plaintiff argues that when Defendant Isaacs finally responded to Plaintiff's grievance, she "prepared a misleading and woefully incomplete response" since she claimed, incorrectly, that Plaintiff did not notify staff previously about needing his medication refilled until November 29, 2016 (Doc. 99, p. 11).

While there is an argument that Defendant Isaacs could have been negligent in not responding sooner to Plaintiff's grievances and his grievance counselor's emailed request, Defendant Isaacs' actions did not rise to the level of intentional or reckless conduct. In fact, Plaintiff admits that while he *may* have met Defendant Isaacs once (at some point during his time at Big Muddy), he never mentioned anything about his psoriasis condition to her. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id.*; *accord Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("Deliberate indifference is intentional or reckless conduct, not mere negligence."); *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence does not violate the Constitution."). The main issue here is that the record does not reflect that Defendant Isaacs knew that Plaintiff's condition posed a serious risk. She first learned of the issue with his medication refill through an email from Counselor Allen, which read: "Inmate was in my office Monday regarding his psoriasis meds. He may have been taken care of by today. He states that he has 135-gram script

and has only received 45 grams on Nov. 9" (Doc. 94-9). There is nothing in this email that conveys to Defendant Isaacs that Plaintiff is in serious pain or that his condition poses a serious health risk.

Similarly, while Plaintiff's grievances provided Defendant Isaacs more information (*e.g.*, Plaintiff details that his psoriasis poses a serious health risk as his plaques are starting to bleed, which could lead to infection. *See* Doc. 94-10), by the time Defendant Isaacs read the grievances, they had already been deemed as non-emergencies and, therefore, did not require an immediate response.[3] The Prison Litigation Reform Act ("PLRA") provides that an inmate may request that a grievance be handled as an emergency by forwarding the grievance directly to the warden. 20 ILL. ADMIN. CODE § 504.840 (2017). If the warden determines that "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the [inmate]," then the grievance is handled on an emergency basis, meaning the warden will expedite processing of the grievance and respond to the inmate, indicating what action shall be or has been taken. *Id.* Per the PLRA, if Plaintiff had designated his grievances as emergency grievances, they would have been forwarded directly to the warden. While the parties disagree as to whether Defendant Isaacs received the grievances before or after they had been

---

[3] Plaintiff attempts to argue that Defendant Isaacs, in a July 2019 supplemental deposition, changed her testimony after originally admitting that the grievances were not deemed as emergency grievances when she first received them (Doc. 94-8, pp. 25-26). In her original testimony, Defendant Isaacs testified that emergency grievances go directly to the warden. While she sometimes also receives a copy of the grievance when it is filed as an emergency, it also goes to the warden and then the warden will send her their response as to whether it is designated as an emergency grievance (Doc 94-8, p. 25-26). Defendant Isaacs' testimony was consistent at the July 2019 supplemental deposition in that the emergency review section was completed already when she first received the grievance in the healthcare unit on December 14, 2016 (Doc. 99-2, p. 8).

designated as non-emergencies by the warden, that discrepancy is not enough to show that Defendant Isaacs' behavior rose to the level of a constitutional violation.

It is undisputed that Defendant Isaacs received the grievance on or around December 14, 2016 and did not provide Plaintiff with a response until January 13, 2017. But a delay in responding to a grievance alone is not enough for a reasonable juror to conclude that Defendant Isaacs was engaging in intentional or reckless conduct in not responding to Plaintiff for a month, particularly since Plaintiff admits he may have met Defendant Isaacs once in his time at Big Muddy and never spoke to her about the seriousness of his psoriasis condition. Additionally, by the time Defendant Isaacs responded to Plaintiff's grievance in January, he already had his medication refill. Accordingly, Defendant Isaacs is entitled to summary judgment.

### B.  Count 3—Deliberate Indifference Claim Against Defendant Neal

Plaintiff contends that during his visits with Defendant Neal on November 29th and December 19th, Defendant Neal was deliberately indifferent to his serious medical need by not providing him with medical treatment for his psoriasis and for delaying and denying him access to his medication. Defendant Neal disagrees, pointing out that during the November 29th appointment, he sent a request to the pharmacy for Plaintiff's medication to be refilled (Doc. 90, p. 12). Defendant Neal could not foresee this medication would not be filled, as that is not his decision, but BosWell's decision or mistake. *Id.* When Plaintiff returned to see Defendant Neal on December 19th, he sent him directly to Dr. Larsen for an examination (*Id.* at pp. 12-13).

"There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Holloway*, 700 F.3d at 1073 (citation omitted). For that reason, a medical professional is entitled to deference in treatment decisions so long as they are based on professional judgment. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citing *Roe*, 631 F.3d at 857 (7th Cir. 2011)). "By definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)). *See also Roe*, 631 F.3d 843 at 859 ("[I]t is implicit in the professional judgment standard itself . . . that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments."). "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." *Zaya*, 836 F.3d at 805. "[W]here evidence exists that the defendant knew better than to make the medical decision that he did, then summary judgment is improper." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)).

In determining whether medical care evidences deliberate indifference to serious medical needs, the court looks at the "totality of an inmate's medical care." *Petties,* 836 F.3d at 728. The "[f]irst, and most obvious" circumstance in which a medical professional's actions may constitute deliberate indifference "is a [doctor's]

decision to ignore a request for medical assistance." *Id.* at 729. A jury can also infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious." *Id.* And in cases "where unnecessary risk may be imperceptible to a lay person," a jury can find deliberate indifference when there is proof that the medical professional's decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* In other words, "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 860 (citing *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998)). In determining whether a deprivation of medical care amounts to deliberate indifference, a court should consider such factors as "the severity of the medical problem, the potential for harm if medical care is denied or delayed and whether any such harm actually resulted from the lack of medical attention." *Burns v. Head Jailor of LaSalle County Jail,* 576 F.Supp. 618, 620 (N.D.Ill.1984).

Because the permissible bounds of competent medical judgment are not always clear, even among the medical community, "it can be challenging to draw a line between an acceptable difference of opinion . . .  and an action that reflects sub-minimal competence." *Petties*, 836 F.3d at 729. The Seventh Circuit has identified a number of circumstances that might suggest deliberate indifference, including when a doctor persists in a course of treatment known to be ineffective; when a doctor "chooses an easier and less efficacious treatment" based on cost or convenience rather than medical

judgment; and an inexplicable delay in treatment which serves no penological interest. *Id.* at 730, 733.

Plaintiff argues, ultimately, that he was harmed by the delay in receiving his prescription, and that Defendants, including Defendant Neal, did not do anything to alleviate his pain in the interim. Not so. Here, the evidence construed in the light most favorable to Plaintiff suggests that even though Plaintiff alleges that Defendant Neal may have spoken to him in an unprofessional manner at times, he did not prevent him from receiving his medication for psoriasis. In fact, Defendant Neal put in another order for Plaintiff's prescription during his first visit on November 29, 2016 and on the second visit, immediately referred Plaintiff to Dr. Larsen. As Defendant Neal is a nurse and does not have the authority to prescribe a new medication for Plaintiff, he followed appropriate protocols and acted on Plaintiff's requests. While Plaintiff would have preferred to receive his prescription immediately from Defendant Neal, the prescription had to be filled by BosWell. Additionally, Plaintiff does not provide any evidence or authority, beyond his own testimony, that his condition worsened ultimately because of this delay in receiving his prescription.

Plaintiff also contends that Defendant Neal should have prescribed him something else to mitigate his condition, such as a topical cream like hydrocortisone. Although Plaintiff argues his condition was fairly serious when he met with Defendant Neal, the record, as a whole, does not reflect that Plaintiff was in serious need of additional treatment during his November 29th appointment with Defendant Neal. Plaintiff's medical records detail that Defendant Neal observed a small red spot on November 29th.

When he returned to see Defendant Neal in December and expressed that he still had not received his prescription and his symptoms had worsened, Defendant Neal immediately referred him to Dr. Larsen. Therefore, even when viewing the facts in the light most favorable to Plaintiff, the medical professionals must have some discretion in the treatments they prescribe. As such, the Court cannot say that "no minimally competent professional would have… responded [differently] under those circumstances." *Roe*, 631 F.3d at 860. Accordingly, Defendant Neal is entitled to summary judgment.

### C.  Count 4—Deliberate Indifference Claim against Defendant Gerst

Plaintiff argues that Defendant Gerst's failure to give Plaintiff "any treatment" on December 15th satisfies the subjective component of the deliberate indifference test (Doc. 99, p. 9). Plaintiff points out that Defendant Gerst cannot remember if he examined all of Plaintiff's body and that if he had, he would have noticed Plaintiff's most painful psoriasis plaques on his legs. *Id.* By not examining him, Plaintiff argues that Defendant Gerst "missed a huge, inflamed, and soon-to-be (if not already) infected psoriasis lesion" that Dr. Larsen diagnosed and treated in an emergency visit just four days later. *Id.* Since Defendant Gerst did not provide Plaintiff with immediate relief, his order of betamethasone during this visit is immaterial.

Defendant disagrees, arguing that Plaintiff alerted Defendant Gerst to the issues with his medication refill on December 15, 2016 (Doc. 90, p. 13). That same day, Defendant Gerst reordered Plaintiff's prescription. When Defendant Gerst examined Plaintiff, he did not report medical signs or symptoms of an immediate need; rather, he saw some dry, red spots on Plaintiff's elbows. *Id.* Less than a week later, Plaintiff received his

medication. *Id.* Additionally, Dr. Larsen did not record that Plaintiff had a "huge, inflamed…infected psoriasis lesion." He recorded that Plaintiff *may* have an infected lesion as it was swollen, but not leaking any liquid.

While Plaintiff would have preferred a different course of treatment, Defendant Gerst's course of treatment relied on his observations as a medical professional. Additionally, when Plaintiff alerted Defendant Gerst to the issues with his medication refill, Defendant Gerst put in a request for a refill. It is not clear from the record that Defendant Gerst's actions were "so plainly inappropriate" or that he made "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway*, 700 F.3d at 1073. Accordingly, Defendant Gerst is also entitled to summary judgment.

### III.    Qualified Immunity

Defendant Isaacs is the only Defendant who argues that she is entitled to qualified immunity (Doc. 94, pp. 14-15). Plaintiff disagrees, arguing that since it is clear that Defendant Isaacs delayed treatment for Plaintiff and, therefore, violated his constitutional rights.

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. It protects an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

The qualified immunity test has two prongs: (1) whether the facts shown, taken in the light most favorable to the party asserting the injury, demonstrate that the officer's conduct violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct.   *See Pearson*, 555 U.S. at 232. *See also Brosseau*, 543 U.S. at 197; *Wilson v. Layne*, 526 U.S. 603, 609 (1999). To be "'clearly established' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015)(citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The right must be established "not as a broad general proposition." *Reichle*, 566 U.S. at 664. Instead, it must be "particularized" such that the "contours" of it are clear to a reasonable official. *Id*. That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Carroll v. Carmen*, 135 S.Ct. 348, 350 (2014).

While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (citing *Purvis*, 614 F.3d at 717), *cert. denied*, 206 L. Ed. 2d 856 (2020). To defeat a defense of qualified immunity, the plaintiff must show that the facts demonstrate "a violation of a

constitutional right," and that the "constitutional right was clearly established at the time of the alleged violation." *Leiser*, 933 F.3d at 701 (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)).

The Court found that Defendant Isaacs has not violated Plaintiff's constitutional rights and, therefore, finds that Defendant Isaacs is entitled to qualified immunity because, even when the facts are taken in the light most favorable to Plaintiff, she did not engage in conduct that violated Plaintiff's constitutionally-protected rights.

<u>CONCLUSION</u>

For the above-stated reasons, Defendants' motions for summary judgment (Docs. 89, 90, 93, and 94) are **GRANTED** and this action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of all Defendants and against Plaintiff and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: November 20, 2020**

<u>s/ Mark A. Beatty</u>
**MARK A. BEATTY**
**United States Magistrate Judge**